`

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET** |
| | * | |
| **VERSUS** | * | **NO. 10-297** |
| | * | |
| **QUENSHEY MITCHELL** | * | **SECTION "L"** |

## ORDER AND REASONS

Before the Court is Defendant Quenshey Mitchell's Motion for New Trial or in the alternative Motion for Judgment of Acquittal. (Rec. Doc. 219). The Court has reviewed the documents and applicable law and, having heard oral argument on this motion, now issues this Order and Reasons.

## I.   BACKGROUND

On January 9, 2014, after a four-day jury trial before this Court, Defendant Quenshey Mitchell was found guilty of all six counts of the six-count Superseding Indictment. Count 1 charged Mitchell with conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin, a Schedule I controlled substance, in violation of 21 USC §§ 841(a)(1), 841(b)(1)(A), and 846. (Rec. Doc. 67 at 1). Count 2 charged Mitchell with conspiracy to kill Cristina S. Williams in order to prevent her attendance at an official proceeding and to prevent her from further communicating with law enforcement, in violation of 18 USC §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(3)(A), and 1512(k). (Rec. Doc. 67 at 2). Count 3 charged Mitchell with aiding and abetting in the unlawful killing of Williams in order to prevent her attendance at an official proceeding and to prevent her from further communicating with law enforcement, in violation of 18 USC §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(3)(A)

and 2.  Count 4, like Count 2, charged Mitchell with conspiracy to kill Williams.  However, unlike Count 2, Count 4 charged that he did so in order to retaliate against her for previously providing information to a law enforcement officer, in violation of 18 USC §§ 1513(a)(1)(B), 1513(a)(2)(A), and 1513(f).  Count 5, like Count 3, charged Mitchell with aiding and abetting in the unlawful killing of Williams.  Count 5 charged that he did so in order to retaliate against her for providing information to a law enforcement officer, in violation of 18 USC §§ 1513(a)(1)(B), 1513 (a)(2)(A) and 2.  Last, Count 6 charged Mitchell with conspiracy to obstruct, influence, and impede an official proceeding, in violation of 18 USC §§ 1512(c)(2) and 1512(k).

## II.   PRESENT MOTION

### A.   Motion for New Trial or for a Judgment of Acquittal  (Rec. Doc. 219)

On March 11, 2014, Mitchell filed the present motion for a judgment of acquittal, as to Counts 2-5, and for a new trial, as to Counts 1 and 6.  Mitchell claims that the Government's evidence is insufficient to support his conviction on Counts 2-5 and, therefore, the Court should enter a judgment of acquittal as to those counts.  (Rec. Doc. 219-1 at 9, 15).  Mitchell is not challenging the sufficiency of the evidence supporting his conviction of Count 1, the heroin conspiracy, or Count 6, the obstruction of justice charge.  (Rec. Doc. 219-1 at 3).  However, as to Counts 1 and 6, Mitchell asks the Court to grant a new trial in the interest of justice.  (Rec. Doc. 219-1 at 9) (citing Fed. R. Crim. P. 33).

More specifically, as to Counts 2 and 4, Mitchell argues that there was insufficient evidence of a conspiracy to kill Cristina Williams.  (Rec. Doc. 219-1 at 9).  Mitchell concedes that a defendant can be convicted of a conspiracy even when the identity of the co-conspirator is unknown.  (Rec. Doc. 219-1 at 10) (citing *United States v. Villasenor*, 894 F.2d 1422, 1428 (5th Cir. 1990)).  However, Mitchell argues that there is no evidence to establish the existence of the

unknown co-conspirators *and* no evidence of any agreement or concert of action on the part of the defendant; thus the conviction of conspiracy to kill Williams cannot stand.  (Rec. Doc. 219-1 at 11).

As to Counts 3 and 5, Mitchell argues that "the link between the evidence and the inference that Mitchell was behind the murder was too attenuated to support a conviction."  (Rec. Doc. 219-1 at 11).  He claims that in order to support a conviction of aiding and abetting under 18 U.S.C. § 2, the Government must prove: "(1) that the underlying crime was committed by someone other than the defendant; and (2) that the defendant either acted or failed to act with the specific intent of enabl[ing] its commission."  (Rec. Doc. 219-1 at 11).  Mitchell argues that the Government presented no evidence at trial to satisfy the second element.  He claims that the Government "stacked speculation" about what was said during phone calls on top of "presumption" about who owned the phones in question.  (Rec. Doc. 219-1 at 12).  Mitchell distinguishes this case from *United States v. Surtain*, in which the Government had evidence that calls were made between the defendant and the co-defendant.  (Rec. Doc. 219-1 at 13) (citing 519 F. App'x 266 (5th Cir. 2013)).  He argues that in the present case there was no evidence as to whom the calls were between.  (Rec. Doc. 219-1 at 13).

With respect to Counts 1 and 6, Mitchell asks the Court to grant a new trial "in the interest of justice."  Mitchell emphasizes that the standard for granting a new trial is more lenient than the standard for judgment of acquittal.  (Rec. Doc. 219-1 at 9).  Mitchell offers three possible grounds for a new trial.  First, he argues that his trial should have been severed and that he was severely prejudiced by the heroin conspiracy and the murder charges being included in the same trial.  (Rec. Doc. 219-1 at 13).  He claims that "the specter of a murder lurking in the background made a conviction on the drug conspiracy inevitable."  (Rec. Doc. 219-1 at 13)

3

(citing *United States v. McRae*, 702 F.3d 806, 828 (5th Cir. 2012)). Mitchell claims that if the heroin conspiracy had been tried alone, a great deal of damaging evidence would have been inadmissible. (Rec. Doc. 219-1 at 13-14).

Second, Mitchell argues that the attorney for the Government made improper statements during the closing argument. (Rec. Doc. 219-1 at 14). He claims that the Prosecutor substituted argument for evidence on numerous occasions and misled the jury. (Rec. Doc. 219-1 at 14). Mitchell claims that the Prosecutor "surmised the contents of telephone conversations" and introduced argument to give meaning and context to telephone calls when there was no evidence regarding those calls in the record. (Rec. Doc. 219-1 at 14). He urges the Court to evaluate the magnitude of the prejudicial effect of the statements, the efficacy of any cautionary instructions, and the strength of the evidence against the defendant in determining whether the statements made during closing argument were permissible. (Rec. Doc. 219-1 at 14).

Third, Mitchell argues that this Court failed to properly instruct the jury on the definition of "aiding and abetting" as charged in Counts 3 and 5 of the Superseding Indictment. (Rec. Doc. 240).[1] He claims that this Court conflated the charge for a principal with the charge for an aider and abettor and that this raises significant due process problems because it resulted in him being convicted of an alternate theory of liability. (Rec. Doc. 240 at 4). Mitchell argues this was

---

[1] Because this issue was raised for the first time during oral argument, the Court ordered that the parties submit briefs to the Court regarding the issue of the incomplete jury charge and how it affected the Defendant's present motion.

In Mitchell's supplemental brief he argues that the Court should "reverse the conviction" due to the improper jury charge. While it is not clear whether Mitchell is asserting that the improper jury charge is grounds for an acquittal or for a new trial, the Court will analyze his arguments under the standard for a Rule 33 motion because the Court does not find that the alleged improper jury charge affected the sufficiency of the evidence presented against Mitchell. Furthermore, the standard for reviewing the motion for a new trial is lower and therefore, more beneficial to Mitchell.

"plain error" and that his lawyer did not, and could not, waive the instruction error.  (Rec. Doc. 240) (citing *United States v. Leon*, 679 F.2d 534 (5th Cir. 1982)).

### B.     Government's Response (Rec. Doc. 230)

In response, the Government contends that Mitchell omits and mischaracterizes several material aspects of the evidence that was presented at his trial.  (Rec. Doc. 230 at 6).  The Government provides an extensive summary of the evidence against Mitchell.  (Rec. Doc. 230 at 6-15).  The Government recounts each witness that was called and what that witness' testimony established.  (Rec. Doc. 230 at 6-15).  The Government claims that it presented multiple pieces of credible evidence demonstrating that Mitchell worked with at least one other person in carrying out the murder of Williams.  (Rec. Doc. 230 at 17).  The Government argues that a conspiracy conviction does not require that the co-conspirators be identified, as long as the evidence supports the proposition that a co-conspirator existed.  (Rec. Doc. 230 at 18) (citing *United States v. Moree*, 897 F.2d 1329 (5th Cir. 1990)).  Further, the Government argues, once it produces enough evidence of an illegal conspiracy, it only needs to introduce "slight evidence" to connect the defendant to the common scheme.  (Rec. Doc. 230 at 19) (citing *United States v. Leahy*, 82 F.3d 624, 633-34 (5th Cir. 1996); *United States v. Duncan*, 919 F.2d 981, 991 (5th Cir. 1990)).

As to the motive element of the charges, the Government argues that it presented "overwhelming" evidence at trial regarding Mitchell's motive.  (Rec. Doc. 230 at 20).  The Government points to evidence that was introduced at trial regarding statements, both oral and written, that Mitchell made about "snitches."  (Rec. Doc. 230 at 20).

As to Mitchell's motion for a new trial on Counts 1 and 6, the Government points out that Mitchell never made a motion for severance and has not provided good cause for his failure to do

so.  (Rec. Doc. 230 at 21).  With regard to Mitchell's argument that joinder prejudiced him because the evidence supporting Counts 2 through 5 was so weak, the Government rebuts this argument by pointing to evidence throughout its brief, highlighting how strong the evidence against Mitchell really was.  (Rec. Doc. 230 at 22).

As to Mitchell's claim regarding statements made during the Prosecutor's closing argument, the Government points out that no contemporaneous objection occurred during the trial.  (Rec. Doc. 230 at 23).  The Government argues that "counsel is accorded wide latitude during closing argument" and the district court's determination of whether those arguments are overly prejudicial is given deference.  (Rec. Doc. 230 at 23) (citing *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994)).  The Government claims that the purpose of the closing argument is to help the jury analyze, evaluate, and apply the evidence.  (Rec. Doc. 230 at 23) (citing *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981)).  The Government argues that the statements made during closing argument were supported by evidence in the record.  (Rec. Doc. 230 at 24).

Last, the Government asks the Court to reject Mitchell's argument regarding the improper jury charge because it is untimely.  (Rec. Doc. 241 at 3).  The Government further argues that this Court's jury charge was sufficient because, taken as a whole, the charge correctly stated the law and clearly instructed the jurors as to the legal principles.  (Rec. Doc. 241 at 4) (citing *United States v. Soto-Silva*, 129 F.3d 340 (5th Cir. 1997)).  Finally, the Government argues that even if the Court's charge was erroneous, it constitutes "invited error" because Mitchell's counsel never objected and actually asked the Court to leave the charge as it stood, without the pattern instruction for aiding and abetting.  (Rec. Doc. 241 at 6).  The Government

characterizes this as a "strategy decision," prompted by the fact that the law regarding aiding and abetting presents the jury with an alternative theory of liability.  (Rec. Doc. 241 at 6).

## III.    LAW & ANALYSIS

Mitchell seeks a judgment of acquittal as to Counts 2-5, the charges that relate to Williams's murder.  Mitchell asks the Court to grant him a new trial as to Counts 1, 6, 3 and 5. The Court will discuss each of these arguments in turn.

### A.    Motion for Judgment of Acquittal

Mitchell asks the Court to enter a judgment of acquittal as to Counts 2-5, the charges that related to Williams's murder.  The Court finds that the evidence presented at trial was sufficient to support the jury's verdict of guilt as to Counts 2-5.  Accordingly, Mitchell's motion for judgment of acquittal is denied.

This motion for acquittal as to Counts 2-5, relating to Williams's murder, is filed pursuant to Federal Rule of Criminal Procedure 29.  Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Further, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(c)(1).

The Fifth Circuit has explained that in determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt."  *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992).  "It is not necessary that the

evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilty, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Id.* (citing *United States v. Chavez*, 947 F.2d 742, 744 (5th Cir. 1991)).

In making this determination, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)). The courts have explained that the jury has the "unique role" of judging the credibility of witnesses and deciding how much weight to give each witness' testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Furthermore, the Court must keep in mind that "[g]enerally speaking, '[w]hat a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly 'use their common sense' in evaluating that evidence.'" *United States v. Villasenor*, 894 F.2d 1422, 1425 (5th Cir. 1990).

In order to properly evaluate Mitchell's motion, the Court will recount some of the relevant testimony and evidence that was presented at trial, and then will analyze that evidence in the context of Counts 2 through 5.

### 1.    *The Evidence Presented at Trial*

The Government called seventeen witnesses to testify and presented three full days of testimony to the jury before it rested. First, the Government introduced evidence pertaining to Count 1, the drug conspiracy. Significantly, two witnesses testified about Mitchell's

involvement in the heroin conspiracy.  David Bailey testified that he received heroin from Mitchell, which he then sold in the New Orleans area.  (Rec. Doc. 215 at 60).  Melony Salvage, Mitchell's girlfriend, also testified that Mitchell transported heroin to New Orleans.  (Rec. Doc. 215 at 196).  DEA Special Agent Jason Gill testified that on December 11, 2009, Cristina Williams was arrested when she arrived in the New Orleans train station.  (Rec. Doc. 214 at 26-58).  Williams was carrying 749.1 grams of heroin in her luggage.  (Rec. Doc. 214 at 67-69).  Salvage testified that on several occasions she and Williams traveled from Los Angeles to New Orleans to assist Mitchell in transporting heroin, and that on this occasion Williams was doing the same.  (Rec. Doc. 215 at 204-227).  Salvage testified that Mitchell would compensate them for making the trips.  (Rec. Doc. 215 at 210).  Salvage testified that Mitchell would often fly from Los Angeles to New Orleans to meet her and Williams when they arrived in New Orleans with the drugs.  (Rec. Doc. 215 at 207).  The Government produced hotel records that corroborated this testimony.  (Rec. Doc. 215 at 208-209). The Government introduced cell phone records indicating that Williams communicated with Mitchell while on the train to New Orleans. (Rec. Doc. 215 at 234).

The Government introduced evidence which established Mitchell's motive for killing Williams.  DEA Special Agent Mark Nicholson testified that Williams was cooperating with law enforcement after her arrest.  (Rec. Doc. 214 at 90-91, 94).  This was reflected in a news article that was published shortly after Williams's arrest.  Salvage and Mitchell were aware of this news article.  (Rec. Doc. 215 at 239).  Salvage testified that after Williams was arrested, Salvage was scared that the authorities were going to start looking for her.  (Rec. Doc. 215 at 238).  Salvage testified that she had conversations with Mitchell about this fear.  Salvage testified that Mitchell assured Salvage that "he would make sure that [Williams] wasn't telling anymore."  (Rec. Doc.

240 at 303).  Williams's father, Darryl Williams, testified that Mitchell met with him and told

him that his daughter was cooperating with law enforcement.  Mr. Williams testified that

Mitchell gave him a copy of the news article during the meeting and stated "you know what

happens to snitches."  (Rec. Doc. 216 at 111).  Further, Salvage testified regarding conversations

that Mitchell had with an unknown third party.  (Rec. Doc. 215 at 248-254).  Salvage testified

that she heard him "talking on the phone saying that he had a situation that he needed to take

care of."  (Rec. Doc. 215 at 249).

A great deal of the Government's evidence involved complex cell phone records and cell

site analysis, which indicated that Mitchell was involved in suspicious activity around the time of

Williams's murder.  Salvage testified that Mitchell maintained an iPhone that was registered in

his name as well as several pre-paid telephones that he continuously replaced.  (Rec. Doc. 215 at

198).  Salvage testified that he used the pre-paid phones for "business, drugs and things like

that."  (Rec. Doc. 215 at 198).  Salvage testified that Mitchell obtained these cellphones from a

store on King and Dinker Street in Los Angeles.  (Rec. Doc. 215 at 198).  This was significant

because throughout the course of the drug investigation, detectives discovered that many of the

phones associated with the drug conspiracy were purchased from the same cell phone store and

all registered to the same fictitious address—934 Avocado Avenue, Newport Beach, CA.

Salvage testified that Mitchell went to that same store to purchase a cell phone for her to use.

(Rec. Doc. 215 at 257).  Special Agent Mark Nicholson testified that when Salvage was arrested,

a search of her apartment produced drug paraphernalia as well as a hand-written list of telephone

numbers.  (Rec. Doc. 215 at 19-28).  Salvage testified that Mitchell had given her that list of

phone numbers.  (Rec. Doc. 215 at 255).

The Government also presented extensive evidence regarding cell phone communications on the night of the murder.  Because of the numerous phone numbers involved, the Court will refer to the phone numbers by the last four digits.  On the night of the murder, Williams's phone was in communication with a phone number ending in 5545.  (Rec. Doc. 216 at 155-157). Williams's sister and roommate, Shavonna Adams, testified that on the night of the murder Williams received a phone call and then left the apartment in a hurry stating that she would be right back.  (Rec. Doc. 215 at 183).  Consistent with this testimony, Los Angeles Police Department Homicide Detective Charles Gieger, the lead detective in Williams's murder, testified that at about 9:56 p.m. on the night of the murder, 5545 made that call to Williams. Detective Gieger testified that according to the cell phone records, this is the last phone call that 5545 ever made.  This call was followed by a text message exchange.  The phone records indicated that Williams messaged 5545 and said "What's taken so long?"  The 5545 number sent a text message back that said "My bad crip i was r0lln n my rearview th0ought i seen the c0ps:! 323 329 1816."  (Rec. Doc. 216 at 156; Government's Exhibit 89).  This text message provided Williams with a different telephone number to call, namely, 1816.  Right after receiving that text message, Williams called 1816.  (Rec. Doc. 216 at 163).  Detective Gieger testified that Williams then communicated with 1816 several times, right up to the time of her murder.  (Rec. Doc. 216 at 160-164).  The Government presented evidence that 1816 was only in existence for seven days prior to the murder and was thereafter discarded.  (Rec. Doc. 216 at 217).

Detective Gieger testified that he obtained cell detail records for 1816.  These records alerted him to a third important number, 4943.  (Rec. Doc. 216 at 164-165).  Detective Gieger explained that there were many calls between 1816 and 4943, including one call just before and one call just after Williams's murder.  (Rec. Doc. 216 at 164).  The 9-1-1 call that reported

Williams's shooting was made at 10:49 p.m. (Rec. Doc. 216 at 164). Detective Gieger testified

that at 10:48 p.m. 1816 called 4943. That was the last call that 1816 ever made. (Rec. Doc. 216

at 164). Detective Gieger further testified that the subscriber records for 5545, 1816 and 4943 all

contained the same false, fictitious address—934 Avocado Avenue, Newport Beach, CA. (Rec.

Doc. 216 at 165-167). Detective Gieger testified that he made a "frequently called number list"

based on the 5545 phone records and identified several people associated with Mitchell who

made calls to or received calls from 5545. (Rec. Doc. 216 at 169). Furthermore, Detective

Gieger found that around July 10, 2010, 5545 traveled to Las Vegas for several days and then

returned. (Rec. Doc. 216 at 170). This was the same time that Salvage testified that she and

Mitchell went to Las Vegas. (Rec. Doc. 215 at 253-254). This suggested that phone 5545 was

with Mitchell. Detective Gieger also discovered that many of the phone numbers that were

found on the piece of paper in Salvage's apartment, which Salvage testified were provided to her

by Mitchell, contacted both 5545 and 4943 numerous times. (Rec. Doc. 216 at 170).

     Salvage testified that on the night of Williams's murder, Mitchell said that he was going

to the Marina del Rey area. (Rec. Doc. 215 at 250). Consistent with this, Detective Gieger

testified that a gas station receipt similarly reflected that Mitchell's credit card was utilized in

Marina del Rey that night. (Rec. Doc. 216 at 174-175).

     The Government's last witness was Los Angeles Police Department Homicide Detective

Sean Hansen, who qualified as an expert in cellular site analysis and geo location of cellular

telephones. (Rec. Doc. 216 at 197-205). Through Detective Hansen, the Government presented

compelling evidence that tied Mitchell to 5545, 1816, and 4943, the three phone numbers that

played a role in Williams's murder. Detective Hansen testified extensively about his efforts to

analyze the call records of several significant telephone numbers and to identify the locations on

Los Angeles area maps of the cellular towers activated by the telephones while they were in use. (Rec. Doc. 216 at 206-237).  Detective Hansen primarily studied five numbers.  Prior to Detective Hansen's analysis, compelling evidence existed that two of these phone numbers belonged to Mitchell.  First, Mitchell's iPhone, which was registered in his name, had the number 1916.  (Rec. Doc. 216 at 216).  Second, Salvage testified that her phone number during July was 1540 and that the person that she contacted the most from that phone was Mitchell. (Rec. Doc. 215 at 256-57).  The phone records for 1540 were obtained and indicated that nine hundred and one phone calls were made to and from 3265 from July 2, 2010 to September 2, 2010.  (Rec. Doc. 216 at 215-216).  Salvage indicated that these calls were made to and from Mitchell.  (Rec. Doc. 215 at 256-57).  Thus there is compelling evidence that Mitchell possessed and used 3265.

The other numbers that Detective Hansen studied were 5545, 1816, and 4943.  Detective Hansen demonstrated that in July 2010 there were several days during which 1916 (Mitchell's iPhone), 3265 (Mitchell's phone which he used to communicate with Salvage), 5545, 1816, and 4943 all utilized cellular towers that serviced significant addresses, such as Mitchell's apartment and Salvage's apartment.  (Rec. Doc. 216 at 216-226).  For instance, Detective Hansen showed that on July 7, 2010, 1816, 1916, 5545, and 3265 all used the cellular tower near a residence occupied by Mitchell and Salvage within minutes of each other.  (Rec. Doc. 216 at 218-219); (Government Exhibit 89 at 29).  Similarly, Detective Hansen showed that on July 10, 2010, 5545, 1916, and Salvage's personal cell phone all used towers in Las Vegas during the time that Salvage testified that she and Mitchell went to Las Vegas.  (Rec. Doc. 216 and 222).  More specifically, those phones utilized cell phone towers that serviced the Luxor Hotel, where Salvage testified that they stayed.  (Rec. Doc. 215 at 248).  This would suggest that Mitchell had

13

access to these phones.  Detective Hansen also showed that on July 28, 2010, the day before the

murder, 5545 and 4943 utilized the same cell phone tower only minutes apart from each other.

This tower serviced the area in which Mitchell's grandmother lived.  (Government Exhibit 89 at

43).

On the day of the murder, Detective Hansen demonstrated that between 3:00 p.m. to 5:00

p.m., 1916 (Mitchell's iPhone), 3264 (Mitchell's phone that he used to communicate with

Salvage), 5545, and 4943 were all being utilized in the same area.  (Government Exhibit 89 at

46).  Detective Hansen further demonstrated that around 5:30 p.m., 4943, 1816, and 3265 all

utilized cell phone towers in the same area.  (Government Exhibit 89 at 47).  This would justify

the conclusion that Mitchell possessed these phones.  Detective Hansen testified that at some

point, however, 1816 became separated from the rest of the phones. (Rec. Doc. 216 at 227).  The

Government suggests that this occurred because 1816 was given to the shooter.  Detective

Hansen testified that around 9:30 p.m. that evening, 3265, 4943, 5545, and 1916 were all utilized

near the Bedford apartment, which was occupied by Mitchell and Salvage.  (Rec. Doc. 216 at

228).  Detective Hansen testified that at 9:56 p.m., 5545 called Williams, and this is the last call

that 5545 ever made.  (Rec. Doc. 216 at 229).  Then at 9:57 p.m., 4943 called 1816.  (Rec. Doc.

216 at 230).  Detective Hansen testified that his analysis indicated that at the time of these calls,

4943 and 5545 were traveling West together toward Marina del Rey, the area in which Mitchell

used his credit card.  (Rec. Doc. 216 at 230).  Detective Hansen was able to determine this

because the call made by 5545 to Williams started at one cell phone tower but terminated at a

different tower.  Detective Hansen testified that this indicated movement.  Significantly, one

minute later, 4943 called 1816 using the cell phone tower which 5545's call had just terminated

on.  (Rec. Doc. 216 at 230).  Detective Hansen then demonstrated that 1816 utilized towers near

14

the crime scene and that 4943, 3265, and 1916 were all located in Marina del Rey.  (Rec. Doc. 216 at 231).  Detective Hansen testified that 1816 appeared to be circling the crime scene.  (Rec. Doc. 216 at 232).  Detective Hansen's analysis showed that 1816 and 4943 were in communication with each other on the night of the murder and that 4943 and 3265 were both located in Marina del Rey at that time.  (Rec. Doc. 216 at 234-235).  Detective Hansen presented phone records for 1816, which showed that between 9:52 p.m. and 10:51 p.m. on the night of the murder, 1816 and 4943 called each other eleven times.  *See* (Government Exhibit 89 at 13).  At 10:48 p.m., 1816 called 4943.  This was the last call that 1816 made and it was made utilizing a cell phone tower near the crime scene.  Detective Hansen also showed that on the morning after the murder, 3265 and 4943 both utilized cellular towers near the apartment that Mitchell and Salvage frequently occupied.  (Rec. Doc. 216 at 235).

With respect to Mitchell's behavior after Williams's murder, Salvage testified that several days after Williams's murder, Salvage heard him on the phone "making a statement as to did they take care of everything, was everything taken care of."  (Rec. Doc. 215 at 253).  Salvage also testified that after she and Mitchell were both arrested, she received numerous letters from Mitchell.  (Rec. Doc. 215 at 258). The Government presented these letters and Salvage testified that they were sent to her by Mitchell.  The letters expressed concern that Salvage was cooperating with law enforcement.  One letter told her to "sticc to the script" and "stay by my side."  (Government's Exhibit 63-B).  Another letter stated "when I see you get hysterical I be like fucc I'm dead. Death penalty. When they tip you, you tip me…"  (Rec. Doc.63-C).  Salvage testified that this letter was received "during the time when [she] still wasn't saying anything in regard to Christina's [sic] murder."  (Rec. Doc. 215 at 263).  Salvage testified

that she received one last letter after Mitchell learned that she was cooperating with law

enforcement.  This letter stated:

> . . . Took me a lil time to register or should I say except the monster you've been forewarning me about for a minute now.  Hit me like a ton of briccs . . . .  Instead you cooperated with the police?  Against me Mel? . . .
>
> . . . You think you can turn on your dog, contradict all that rift raft you was kickin out there, go against all you claimed to stand for, then pray? Lol, silly silly naïve bitch. . . .
>
> . . . But after you make your mind up to testify on me what the fucc does a viper pray about?  . . .
>
> . . . Youra heartless tramp . . . I wouldnt tell on my enemy let alone my friend. My lover? The wrong words about you could get you hurt. . . .
>
> . . . Tellin. Talking. Cooperating. Is the worst possible for a hoodsta.  Or for anyone who breaks the law for that matter. . . I aint gon lie, I be prayin for all rats to dxx violently n painful deaths.

(Rec. Doc. 63-E).

### 2.    *Counts 2 and 4 – Conspiracy*

Viewing all of the evidence, and the inferences that may be drawn from the evidence, in

the light most favorable to the verdict, the Court finds that the evidence is sufficient to support

Mitchell's conviction of conspiring to kill Williams.

Generally, a conspiracy conviction requires proof beyond a reasonable doubt that (1) two

or more persons, directly or indirectly, reached an agreement; (2) that the defendant knew of the

unlawful purpose of the agreement; (3) the defendant joined in the agreement wilfully with the

intent to further its unlawful purpose.  *See United State v. Brooks*, 681 F.3d 678, 699 (5th Cir.

2012); *see also United States v. Medina*, 887 F.2d 528, 530 (5th Cir. 1989) ("The essential

elements of conspiracy are: (1) the existence of a conspiracy; (2) knowledge of the conspiracy;

and (3) voluntary participation in the conspiracy.")  The Fifth Circuit has explained that "[a]

conspiracy conviction does not depend on the identification of the co-conspirators.  The co-

conspirators need not be identified as long as evidence supports 'the proposition that such co-conspirators did exist and that the defendant did conspire with him.'" *United States v. Moree*, 897 F.2d 1329, 1332 (5th Cir. 1990) (quoting *United States v. Pruett*, 551 F.2d 1365, 1369 (5th Cir. 1977)). Furthermore, "[t]he 'agreement between the co-conspirators and the defendant need not be proved by direct evidence, but may be inferred from concert of action.'" *Medina*, 887 F.2d at 531. "Such action may be inferred from the circumstances as a whole." *Id.*

The evidence presented in this case supports the theory that Mitchell reached an agreement with someone else to kill Williams in order to prevent her from cooperating with law enforcement and to retaliate for her past cooperation. The jury heard evidence regarding Williams's cooperation with law enforcement as well as Mitchell's awareness of this cooperation. The jury heard evidence from Williams's father regarding a comment made by Mitchell that "you know what happens to snitches" as well as a comment made by Mitchell to Salvage that "he would make sure [Williams] wasn't telling anymore." The jury also heard testimony regarding letters that Mitchell wrote to Salvage expressing his negative opinion of people who cooperate with law enforcement. This evidence, establishing Mitchell's motive, was then coupled with evidence tying Mitchell to several relevant telephone numbers. The phone records demonstrated a striking connection between phones that are identified as belonging to Mitchell and phones that are connected to the murder. The elaborate pattern of cell phones that came in and out of existence strongly supports the conclusion that someone was trying to cover up illegal activity. Further, based on the cell site analysis indicating that 1816 was located near the murder scene and was in contact with Williams up until the time of the murder and ceased to exist thereafter, a rational jury could have concluded that the person who possessed 1816 murdered Williams. Based on the cell site analysis from the month of July, showing that on

17

numerous occasions 3265, 1916, 5545, 4943, and 1816 were utilized in the same location at the same time where Mitchell was known to be, a rational jury could find that Mitchell possessed both 5545 and 4943, thereby finding that Mitchell was in communication with both Williams and the murderer on the night of Williams's murder.  This evidence supports the Government's theory that Mitchell gave 1816 to his co-conspirator on the day of the murder, lured Williams out of her house when he called her from 5545, and then called 1816 to arrange her murder.  The jury could have inferred that the calls made between 4943 and 1816 were made to discuss Williams's murder.  This theory is further supported by the flurry of communication between 4943 and 1816 during the time of the murder as well as the fact that 5545 and 1816 are never used thereafter.

Mitchell argues that there is no evidence tying him to 5545 and points to Porsha Buchanen's testimony as supporting the proposition that Mitchell *did not* possess 5545.  During the trial, Porsha Buchanen, who had ninety-eight calls made to or from 5545 in July 2010, testified that 5545 belonged to her boyfriend "Rotney."  (Rec. Doc. 216 at 81).  The Government, however, called Ms. Buchanen's credibility into question by presenting the transcript from her testimony in front of the grand jury, which was inconsistent with her testimony at trial.  (Rec. Doc. 216 at 77).  Before the Grand Jury she testified that 5545 belonged to Mitchell.  As this Court previously explained, the jury has the unique role of judging the credibility of witnesses.  *See Layne*, 43 F.3d at 130 (5th Cir. 1995).  The Court must accept all credibility choices that tend to support the jury's verdict.  *See Sneed*, 63 F.3d at 385.  Accordingly, Ms. Buchanen's testimony at trial is by no means dispositive.

Mitchell cites the Fifth Circuit's opinion in *United States v. Villasenor*, for the proposition that the Government must present some evidence of either the existence of unknown

co-conspirators or of an agreement or concert of action on the defendant's part.  (Rec. Doc. 219-1 at 10) (citing 894 F.2d 1422, 1428 (5th Cir. 1990)).  In *Villasenor*, the Fifth Circuit reversed the defendant Arnoldo's conviction for conspiracy finding that "the evidence presented against Arnoldo establishes neither the existence of any unknown co-conspirators, such as buyers or sources, nor any agreement or concert of action on Arnoldo's part with any such other." *Villasenor*, 894 F.2d at 1429.  In *Villasenor*, the DEA found approximately 1,069 pounds of marijuana wrapped in bundles inside the defendant's house.  *Id.* at  1425.  The court found that there was enough evidence to support the defendant's conviction for possession of marijuana with intent to distribute.  *Id.* at 1426.  The court pointed to the fact that the defendant resided at the house, kept the door to the bedroom locked, had no legitimate means of income, as well as the fact that the DEA found the marijuana in bundles along with packaging supplies.  *Id.*  The court, however, found that there was insufficient evidence to support his conspiracy conviction. *Id.* at 1430.  The court stated that "[w]hile we may well suspect that there likely were some [co-conspirators], there is no concrete or specific evidence of any.  There is simply no evidence at all of when, or how, or from whence the marijuana came to the locked room in the house."  *Id.* at 1430.

The present case is distinguishable from *Villasenor* because here the Government *did* put forth evidence supporting the existence of an unknown co-conspirator.  The Government's entire theory of the case revolved around Mitchell working with an unknown co-conspirator to kill Williams.  The evidence is replete with support for the conclusion that a co-conspirator existed, even though that co-conspirator's identity remains unknown.  This is different from the evidence in *Villasenor*, where no evidence was presented regarding the existence of a co-conspirator, known or unknown.

The Court recognizes that the Government's evidence regarding the phone records was very complex.  It required the processing of testimony from several lay witnesses, detectives, and an expert witness in order to understand the intricate relationship that the various cell phone numbers had with each other.  The Court further recognizes that the evidence relating to the various cell phones alone might not have been sufficient to support Mitchell's convictions. However, the phone records and analysis coupled with the circumstances involving Williams's cooperation with law enforcement, which was known to Mitchell, and Mitchell's verbal threats and suspicious conversations were sufficient to support the jury's guilty verdict on Counts 2 and 4.  A reasonable jury could, and did, process all of this information, draw proper inferences, and conclude that Mitchell worked with someone in order to have Williams killed.

### 3. Counts 3 and 5 – Aiding and Abetting

The Defendant next argues that the evidence is insufficient to support Mitchell's conviction of Counts 3 and 5, aiding and abetting in the murder of Williams.  The Court disagrees.

18 U.S.C. § 2 provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  A conviction under this provision "requires sufficient proof that 'the elements of the substantive offense occurred and that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture succeed."  *United States v. Surtain*, 519 Fed. Appx. 266, 275 (5th Cir. 2013) (quoting *United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001)).  For the reasons discussed above, a rational jury could have found that Mitchell lured Williams out of her house, put her in touch with the

20

murderer, contacted the murderer and, at a minimum, encouraged his actions, thereby aiding and abetting in the murder.

Mitchell cites the Fifth Circuit's unpublished opinion in *United States v. Surtain*, in which the court held that the evidence was sufficient to support the defendant's conviction for use-of fire to commit obstruction of justice and aiding and abetting.  519 Fed. Appx. 266. Mitchell claims that the evidence in *Surtain* "stands in contrast" to the evidence against Mitchell because it was much stronger.  The Court disagrees.  In *Surtain*, the defendant, Moss, was accused of counseling his co-defendant, Samuels, into destroying a van.  The government relied on evidence showing that "(1) Moss had a strong motive to destroy the murder evidence in the van; (2) Moss placed a five-minute phone call to Samuels approximately five-and-a-half hours before the van was burned; and (3) Moss was returning a call that Samuels had placed to Moss's 'burner' cell phone, which had been used only in connection with criminal activity."  *Id.*  The Fifth Circuit concluded that "[a]lthough the jurors did not know and could not have known with certainty the content of the phone conversation, they hardly could have believed that Samuels called Moss to discuss the weather.  Samuels had not spoken to Moss in days, yet he suddenly and urgently sought to contact Moss mere hours before the van fire.  Given the strong inference that they spoke about the van fire, and Moss's overwhelming motive to destroy the murder evidence, the jury could have found beyond a reasonable doubt that Moss, at a minimum, gave words of encouragement to Samuels in violation of the federal aiding-and-abetting statute.  519 Fed. Appx. at 277.

The Court finds that the evidence presented against Mitchell is even stronger than the evidence in *Surtain*.  A telephone that was connected to Mitchell, through cell site analysis spanning the course of a month, participated in eleven phone calls with a cell phone located at

the scene of the murder.  Those eleven phone calls were placed within an hour of the murder.

Just like the jury in *Surtain*, the jury in this case could have reasonably inferred that Mitchell was

talking to 1816 about the murder.  The jury could have concluded that, at a minimum, Mitchell

gave words of encouragement.  This evidence, coupled with Mitchell's strong motive and

incriminating comments, is sufficient to support Mitchell's conviction for aiding and abetting.

### B.    Motion for a New Trial

Mitchell asks the Court to grant him a new trial based on three grounds.  First, he argues

that his trial should have been severed.  Second, he argues that the prosecutor made improper

comments during his closing argument.  Third, he argues that the Court delivered an inadequate

jury charge as to Counts 3 and 5.  The Court will discuss each in turn.

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice requires."  This

Rule also provides that "[a]ny motion for a new trial grounded on any reason other than newly

discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R.

Crim. P. 33(b)(2).  The Fifth Circuit has stated that a court "should not grant a motion for new

trial unless there would be a miscarriage of justice or the weight of evidence preponderates

against the verdict."  *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).  The Fifth Circuit

has stated that "motions for new trial are not favored, and are granted only with great caution."

*United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (citing *United States v. Hamilton*,

559 F.2d 1370, 1373 (5th Cir. 1977)).  Unlike a motion for judgment of acquittal, when deciding

whether to grant a new trial, the court may "weigh the evidence and may assess the credibility of

the witnesses during its consideration."  *United States v. Ramos-Cardenas*, 524 F.3d 600, 605

(5th Cir. 2008) (quoting *United States v. Robertson*¸ 110 F.3d 1113, 1116 (5th Cir. 1997)).

#### 1.     Severance

Mitchell argues that trying him "for involvement in the Williams murder (Counts 2-5), without any meaningful evidence to support those charges, together with the heroin conspiracy (Count 1), severely prejudiced the jury's consideration of his guilt on Count 1."  (Rec. Doc. 219-1 at 13).  Because all six charges were part of a "common scheme or plan," and because the evidence was sufficient to support Mitchell's conviction on all six counts, the Court finds that the fact that Mitchell was tried jointly does not warrant a new trial.

Federal Rule of Criminal Procedure 8(a) provides that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged— whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Even when charges are properly joined under Rule 8, a Court can still sever the charges under Federal Rule of Civil Procedure 14.  Rule 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  "The decision to grant or deny a motion for severance under Rule 14 is committed to the broad discretion of the trial court."  *United States v. Chagra*, 754 F.2d 1186, 1188 (5th Cir. 1985).  A district court's denial of a motion for severance should not be reversed unless "there is 'clear, specific and compelling prejudice that resulted in an unfair trial.'"  *United States v. Singh*, 261 F.3d 530, 533 (5th Cir. 2001) (quoting *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995)).  The Fifth Circuit has explained that "[c]lear prejudice may result when the jury is unable to separate the evidence and apply it to the proper offenses, or where the jury might use the evidence of one of the crimes to infer criminal

disposition to commit the other crimes charged." *United States v. Fortenberry*, 914 F.2d 671, 675 (5th Cir. 1990).

The six counts that were charged against Mitchell were part of a "common scheme or plan." The Fifth Circuit has explained that "[a]n indictment states a common scheme under Rule 8(a) when it alleges that a defendant has attempted to escape liability for one criminal offense through the commission of others." *Chagra*, 754 F.2d at 1188 (finding that a defendant's charges for murder, conspiracy to murder, obstruction of justice, and drug trafficking were part of a single plan to murder a federal judge and were, therefore, properly joined). According to *Changra*, the six counts against Mitchell were all related insofar as Counts 2-5 pertained to Mitchell's attempt to escape liability for Count 1, the heroin conspiracy, by killing a witness to the drug conspiracy. Similarly, Count 6 charged him with obstructing justice, which was also done in an attempt to escape liability.

Furthermore, the Court has already explained that it disagrees with Mitchell's characterization of the "paper-thin" evidence pertaining to Counts 2-5. With respect to Count 1, the evidence against Mitchell was compelling. Therefore, his conviction of Count 1 cannot now be the basis of his claim that he was prejudiced by the joint trial. The Court finds that there was sufficient evidence for a reasonable jury to find Mitchell guilty of all six counts. Accordingly, the joint trial did not result in a miscarriage of justice that warrants a new trial.

### 2.    *Prosecution's Closing Argument*[2]

Mitchell argues that comments made by the prosecutor during closing argument were "flatly improper" and that these comments affected his substantial rights. (Rec. Doc. 219-1 at

---

[2] The Court notes that Mitchell did not object to the prosecutor's closing argument during the trial.

14).  Because the Court disagrees with Mitchell's argument that the comments were "improper,"
the Court does not find that the prosecution's closing argument warrants a new trial.

When a defendant asks for a new trial on the basis of allegedly improper comments by
the government at trial, the court should perform a two-step analysis.  *See United States v. Poole*,
735 F.3d 269, 272 (5th Cir. 2013).  "First, [the court] must determine whether the challenged
comments were actually improper."  *Id.*  If the challenged comments are not legally improper,
the court has no discretion to order a new trial.  If the comments are legally improper, the court
should then evaluate whether "there is a meaningful risk that the verdict was improperly
affected" by the prosecutor's statements.  *See United States v. Mendoza*, 522 F.3d 482, 492 (5th
Cir. 2008).

The Fifth Circuit has explained that "[t]he purpose of closing argument is to assist the
jury in analyzing and evaluating the evidence."  *United States v. Washington*, 44 F.3d 1271, 1279
(5th Cir. 1995).  "A prosecutor is confined in closing argument to discussing properly admitted
evidence and any reasonable inferences or conclusions that can be drawn from that evidence.  'A
prosecutor may not directly refer to or even allude to evidence that was not adduced at trial.'"
*United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (quoting *United States v. Murrah*,
888 F.2d 24, 26 (5th Cir. 1989)); *see also*, *Washington*, 44 F.3d at 1278 ("a prosecutor is not
prohibited from 'recit[ing] to the jury those inferences and conclusions he wishes [the jury] to
draw from the evidence so long as those inferences are grounded upon the evidence'").

In the present case, the Court finds that the Government's comments during the closing
argument were *not* legally improper.  Pursuant to the Fifth Circuit's directive in *Washington*, the
Government used the closing argument to assist the jury in analyzing and evaluating the
evidence that was properly submitted.  The Government's discussion of what conversations may

have taken place during the documented phone calls was a proper discussion of the reasonable inferences and conclusions that could have been drawn from all of the evidence that was presented.   The Court does not find that the Government included any mention of evidence that was not presented to the jury.   Accordingly, the Court finds that the closing arguments did not result in manifest injustice warranting a new trial.

3.      *Improper Jury Charge*

Mitchell argues that this Court's jury instructions regarding Counts 3 and 5, the aiding and abetting charges, were improper and that this warrants a new trial.

In order to put this argument in perspective, the Court will briefly describe the events that took place regarding the jury instructions that were presented to the jury.   At the conclusion of the trial, both parties submitted proposed jury instructions to the Court.   (Rec. Docs. 184, 187). Mitchell submitted four pages of proposed jury instructions.   Mitchell requested that the Court give the substantive offense instruction from the 2012 Fifth Circuit Criminal Jury Instructions for "2.89 Controlled Substances – Conspiracy."   (Rec. Doc. 184 at 2).   This is the only substantive instruction that Mitchell requested.   The Government submitted twenty pages of proposed jury instructions.   The Government did not request the pattern jury charge for aiding and abetting, as provided in the 2012 Fifth Circuit Pattern Jury Instructions – Criminal.   The Court considered the parties' proposed jury instructions and drafted its own instructions to the jury, incorporating the suggestions made by each party.   On the morning of the last day of trial, the Court met with counsel for each side to review the jury instructions.   In open court, the Court asked if there were any objections to the jury instructions.   Neither party objected.   (Rec. Doc. 192 at 1).

After both parties delivered their closing arguments, the Court read the jury instructions to the jury.   The Court's instructions on Count 3 provided:

In Count Three, <u>Quenshey Mitchell is charged with aiding and abetting</u> in the unlawful killing, with malice aforethought, of Cristina S. Williams willfully, deliberately, maliciously and with premeditation on or about July 29, 2010, in order to prevent the attendance and testimony of Cristina S. Williams in an official proceeding and to prevent Cristina S. Williams from communicating further, to a law enforcement officer of the United States, information relating to her knowledge of a conspiracy to distribute and possess with intent to distribute heroin as set forth in Count One of the Superseding Indictment, in violation of 18, United States Code, Sections 1512(A)(1)(A) and (C), and 1512(A)(3)(A) and 2.

Title 18, United States Code, Sections 1512(A)(1)(A), (C) and 2, make it a federal crime for anyone to intentionally kill another person to 1) prevent that person's attendance or testimony as a witness in an official proceeding and/or 2) prevent that person from communicating information relating to the commission of a federal offense to a law enforcement officer of the United States.

For you to find the Defendant guilty of this crime, you must be convinced that the Government has proven each of the following elements beyond a reasonable doubt:

First: The Defendant killed <u>or caused Williams to be killed</u>;

Second: Williams was a witness; and

Third: The Defendant did so with intent to prevent Williams's attendance or testimony in an official proceeding or to prevent Williams from communicating to a law enforcement officer of the United States information relating to Count One. You do not have to find that the intent was both to keep Williams from testifying in an official proceeding *and* to prevent her from communicating to a law enforcement officer, but you do have to be unanimous as to what the intent of the agreement was.

(Rec. Doc. 191 at 23-25) (emphasis added).  The Court's instruction for Count 5 provided:

In Count Five, <u>Quenshey Mitchell is charged with aiding and abetting</u> in the unlawful killing, with malice aforethought, of Cristina S. Williams willfully, deliberately, maliciously and with premeditation on or about July 29, 2010, with intent to retaliate against Cristina S. Williams for providing information to a law enforcement officer of the United States relating to her knowledge of a conspiracy to distribute and to possess with intent to distribute heroin as set forth in Count One of the Superseding Indictment, in violation of 18, United States Code, Sections 1513(A)(1)(B), 1513(A)(2)(A) and 2.

Title 18, United States Code, Sections 1513(A)(1)(B), makes it a federal crime for anyone to kill another person with intent to retaliate against that person for providing information to a law enforcement officer of the United States relating to the commission of a federal offense.

For you to find the Defendant guilty of this crime, you must be convinced that the Government has proven each of the following elements beyond a reasonable doubt:

First: The Defendant killed <u>or caused Williams to be killed</u>;

Second: The Defendant did so with the intent to retaliate against Cristina S. Williams for providing a law enforcement officer with information relating to the commission of a federal offense, heroin conspiracy (Count One).

(Rec. Doc. 191 at 26-28) (emphasis added).

As the Court was reading the jury instructions to the jury, the attorney for the Government asked if the lawyers could approach the bench before the conclusion. At a sidebar conference, the following conversation took place:

Mr. McSherry [Prosecutor]: Judge, I just recognized that you left out the definition of aiding and abetting with the pattern instruction for Counts 3 and 5 also charged in 18 USC 2.

The Court: Did you give that to me?

Mr. McSherry: I don't think we did. That's our problem. But it is a pattern instruction and it goes to this case with the standard instruction of 18 USC 2 because that is charged. And I just recognized that. It's our fault.

The Court [looking at Defense Counsel]: What's your position?

Mr. Jordan [Defense Counsel]: I say let's go with it as it is.

The Court: Comes at a late time. I would say caused to be, you did it or caused to be done.

Mr. McSherry: We can live without it, Judge. I just wanted to bring it to your attention.

28

(Rec. Doc. 237 at 80-81).  After this conversation, and at the suggestion of the Defense Counsel, the Court concluded the jury instructions and did not add the pattern instruction for aiding and abetting.

a.    <u>Sufficiency of the Jury Charge</u>

The Fifth Circuit has explained that "the standard of review for the jury instructions 'is whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Chen*, 913 F.2d 183, 186 (5th Cir. 1990) (quoting *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir. 1990)).  The Fifth Circuit has also explained that "[t]rial judges have substantial latitude in tailoring their instructions if they fairly and adequately cover the issues presented in the case."  *United States v. Masat*, 948 F.2d 923, 928 (5th Cir. 1991).  The Fifth Circuit has made clear that "[a]lthough the Pattern Jury Instructions provide a useful guide for the district courts, we have never required the trial courts in this Circuit to use any particular language in a jury charge."  *United States v. Williams*, 20 F.3d 125, 131 (5th Cir. 1994) (citing *Masat*, 948 F.2d at 928).  According to the Fifth Circuit's statement in *Williams*, the fact that this Court's jury instructions for Counts 3 and 5 did not mirror the Fifth Circuit's Pattern Jury Instructions does not make those instructions insufficient.  Instead, the Court must look to the instructions "as a whole" and determine if they correctly stated the law and clearly instructed the jurors as to the principles of law applicable in this case.

Recently, in *Rosemond v. United States*, the Supreme Court elaborated on the federal aiding and abetting statute, 18 U.S.C. § 2.  134 S.Ct. 1240, 1245 (2014).  The Court explained that this statute "reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission."  *Id.*

29

(citing J. Hawley & M. McGregor, Criminal Law 81 (1899)).  In order to be liable under § 2 for

aiding and abetting a crime, a person must (1) take an affirmative act in furtherance of that

offense, (2) with the intent of facilitating the offense's commission.  *Rosemond*, 134 S.Ct. at

1245 (citing 2 W. LaFave, Substantive Criminal Law § 13.2, p. 337 (2003) (an accomplice is

liable as a principal when he gives "assistance or encouragement . . . with the intent thereby to

promote or facilitate commission of the crime")); *Hicks v. United States*, 150 U.S. 442, 449

(1893) (an accomplice is liable when his acts of assistance are done "with the intention of

encouraging and abetting" the crime)).  These same elements can be found in the Pattern Jury

Instruction, which Mitchell now urges that this Court omitted.  The Pattern Jury Instruction for §

2 states that in order for a jury to find a defendant guilty, the jury must be convinced that the

government has proved: "*First*: That the offense of _____ was committed by some person;

*Second*: That the defendant associated with the criminal venture; *Third*: That the defendant

purposefully participated in the criminal venture; and *Fourth*: That the defendant sought by

action to make that venture successful."  Fifth Circuit Pattern Jury Instructions – Criminal 2.06.

     The jury instructions that were used by this Court, taken as a whole, correctly state the

law and clearly instruct the jurors as to the principles of that law.  Every element covered in the

Pattern Jury Instruction was included in this Court's instruction.  First, in both Counts 3 and 5,

the Court started by stating that Mitchell was charged with "aiding and abetting in the unlawful

killing, with malice aforethought, of Cristina S. Williams . . ."  (Rec. Doc. 191 at 23, 26-27).

Thus, the Court clearly stated that the underlying offense was the killing of Williams and that

Mitchell was charged with aiding and abetting in that offense.  In both charges, the Court

required the jury to find, beyond a reasonable doubt, that Mitchell "killed or caused Williams to

be killed."  If the jury found, which it did, that Mitchell killed or caused Williams to be killed,

then the jury clearly found that the second element in the Pattern Jury Instructions was met—
Mitchell "associated with the criminal venture" and "sought by action to make that venture
successful."  Furthermore, the Court stated that Mitchell was charged with aiding and abetting
"willfully, deliberately, maliciously and with premeditation . . ."  To find Mitchell guilty of
Count 3, the Court required the jury to find that Mitchell acted "with the intent to prevent
Williams's attendance or testimony in an official proceeding or to prevent Williams from
communicating to a law enforcement officer . . ."  (Rec. Doc. 191 at 23).  To find Mitchell guilty
of Count 5, the Court required the jury to find that Mitchell acted "with the intent to retaliate
against Cristina S. Williams for providing a law enforcement officer with information relating to
the commission of a federal offense, heroin conspiracy . . ."  (Rec. Doc. 191 at 27).  These
statements about Mitchell's willful and deliberate conduct, as well as the requisite intent
element, covered the intent element that is required to be convicted of aiding and abetting.  As
the Pattern Jury Instructions provide, this Court's instructions insured that the jury would find
that Mitchell's participation in the criminal venture was purposeful and that Mitchell sought to
make the criminal venture successful when he "killed or caused Williams to be killed."

While this Court's language differed from the  Pattern Jury Instruction for aiding and
abetting, all of the essential elements were included.  If anything, this Court's instruction set a
higher bar than the Pattern Jury Instructions, ensuring that any resulting jury verdict was
legitimate and guided by an accurate description of the law.  Accordingly, the Court does not
find that the jury instructions given in this case provide grounds for a new trial.

It should also be noted that this Court's decision not to add the Pattern Jury Instruction's
language for aiding and abetting was partially, if not fully, based on Mitchell's trial counsel's
request.  Before the Court had concluded the jury charge, the Government alerted the Court that

31

there was a potential problem.  The Government at first indicated that it wanted the Court to add language from the Pattern Jury Instruction for 18 U.S.C. § 2 aiding and abetting, which the Court had not included.  At that moment, the Court could have easily added the additional language to more fully reflect the Pattern Jury Instructions.  The Court turned to Mitchell's counsel and asked him for his position.  Mitchell's counsel said "I say let's go with it as it is."  The Government then acquiesced.  The Court decided to do as Defense Counsel requested.  Mitchell's counsel may have been motivated by his belief that the jury charge, as read by this Court, set a higher bar than the Pattern Jury Instruction.  Whatever the reason for his position, the Fifth Circuit has explained that "[a] defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby." *United States v. Page*, 661 F.2d 1080, 1083 (5th Cir. 1981) (quoting *United States v. Lewis*, 524 F.2d 991, 992 (5th Cir. 1975)).  In *Page*, the Fifth Circuit emphasized that the trial court "did what [the defendant], explicitly by counsel . . . asked it to do.  [The defendant] will not now be heard to say that the court fell into technical error in the process of effectively carrying out his request." *Id.*  Similarly, this Court did what Mitchell's counsel asked it to do.  Mitchell cannot now claim that this Court's omission of the Pattern Jury Instructions is grounds for a new trial.

IV.    **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Mitchell's Motion for Acquittal or in the alternative Motion for New Trial (Rec. Doc. 219) is hereby **DENIED**.

New Orleans, Louisiana this 13th day of August, 2014.

_____
UNITED STATES DISTRICT JUDGE

32